UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:                                              Chapter 11

DEWEY & LEBOEUF LLP,                                Case No. 12-12321 (MG)

                Debtor.

------------------------------------x

ROY E. HAHN, LARRY J. AUSTIN,
CHENERY ASSOCIATES INCORPORATED
And CHENERY MANAGEMENT INCORPORATED,

                Plaintiffs,

-- against –                                        Adversary Proceeding No.

ALAN M. JACOBS, THE LIQUIDATING TRUSTEE
FOR AND ON BEHALF OF THE DEWEY & LEBOEUF
LIQUIDATION TRUST,

                Defendant.

------------------------------------x

## ADVERSARY COMPLAINT AND JURY DEMAND

Plaintiffs Roy E. Hahn, Larry J. Austin, Chenery Associates Incorporated and Chenery Management Associates by their attorneys, BaintonLynch LLP, for their adversary complaint against Alan M. Jacobs, The Liquidating Trustee For and On Behalf of the Dewey & LeBoeuf Liquidation Trust, respectfully aver:

**Nature of this Adversary Proceeding**

1. This is an action to recover money damages caused by the legal malpractice of Defendant's predecessor in interest.

2. Plaintiffs filed Proofs of Claim Nos. 936, 1155, 1156 and 1157 in the amount of at least $50 Million for the claims that are the subject matter of this adversary proceeding in the main above-entitled bankruptcy case.

3. At various dates in July 2013 Plaintiffs entered into substantively identical stipulations with the Defendant that provided that: (a) Plaintiffs "shall have unliquidated Class 5 – Insured Malpractice Claims under the [Court approved] Plan [of Liquidation] recoverable under the Insurance policies (the "Allowed Claim"); provided, however, the Claimants otherwise waive any and all claims against the Debtor's estate on account of the Allowed Claim, including any Uninsured Malpractice Claim (as defined in the Plan); provided, further, and for the avoidance of any doubt, any recovery on account of the Allowed Claim shall be first credited, to the extent necessary, in satisfaction of any Net SIR (as defined in the Plan) obligations of the Debtor under the Insurance Policies. Accordingly, [Plaintiffs' proofs of claim] shall each be treated as an allowed unliquidated Class 5 – Insured Malpractice Claim under the Plan, to be paid by the Debtor pursuant to and solely from available proceeds of the Insurance Policies."

4. Nothing hereafter averred should be interpreted to be in derogation of the plain language of these stipulations.

**The Parties**

5. Plaintiff Roy E. Hahn ("Hahn") is a natural person and a citizen of the State of California.

6. Plaintiff Larry J. Austin ("Austin") is a natural person and a citizen of the State of Virginia.

7. Plaintiff Chenery Associates Incorporated ("Chenery") is a corporation organized under the laws of the State of California that maintains its principal place of business there.

8. Plaintiff Chenery Management Incorporated ("CMI") is a corporation organized under the laws of the State of Delaware that maintains its principal place of business in California.

9. Defendant Alan M. Jacobs is the Liquidating Trustee for and on behalf of the Dewey & LeBoeuf Liquidation Trust.

10. The Dewey & LeBoeuf Liquidation Trust is the successor in interest to Dewey & LeBoeuf LLP.

11. Dewey & LeBoeuf was the successor in interest to LeBoeuf, Lamb, Greene & MacRae ("LeBoeuf").

**Background of This Action**

12. In the 1990's Hahn and Austin had each earned independently very favorable reputations as arrangers of successful tax advantaged investments.

13. By the year 2000, Austin had been or was a principal in a number of investment firms, including the Starwalker Group LLC, Gilman Financial Services, Republic Group and K-Pipe.

14. Prior to 2000, Hahn had conducted his affairs through Chenery.

15. By reason of toiling in the same fields, Messrs. Hahn and Austin were well acquainted.

16. They had both employed on a regular basis the legal services of one Graham Taylor, a preeminent tax lawyer, who started his career in the tax department of Coudert Brothers in New York City.

17. When Mr. Taylor wished to relocate to the West Coast, he joined the distinguished San Francisco headquartered firm of Pillsbury, Madison & Sutro in 1981 and became a partner in 1986. He remained a partner at that firm until 1999.

18. In 1999, Mr. Taylor withdrew from the Pillsbury firm to join LeBoeuf as a partner in its tax department.

19. Mr. Taylor told his clients at the time and has since testified under oath that he made the move because he believed that LeBoeuf with its many offices could better service his more international practice.

20. In late 2000, Hahn and Austin conceived of an international investment strategy based upon the then Asian debt crisis that could be very attractive to high net worth American investors in terms of providing them (a) long term capital gains and (b) short term tax deferrals.

21. Both Hahn and Austin had considerable experience with the Asian financial markets.

22. At the core of their concept was the kind of gains that well known investment funds like Apollo had made during a similar crisis in the American economy by purchasing the depressed debt of fundamentally sound companies from the FDIC and the RTC.

23. Literally the day after they conceived of what would ultimately become known as a "Non-performing Loan Investment Program" – "NPL" for short – Hahn and Austin met with Taylor to get his initial view as to whether their concept might "work."

24. Taylor's initial impression was that it could work.

25. At this point in time, Austin and Hahn decided to pursue their nascent NPL program through Chenery.

26. They then immediately engaged LeBoeuf as their legal advisor.

4

27. Taylor and other lawyers from LeBoeuf were involved with literally every decision regarding the structuring of the NPL program so that Chenery would be certain that it was compliant with all United States and foreign laws and regulations.

28. At Chenery's expense LeBoeuf lawyers traveled all over Asia as part of their due diligence and performance of their legal services.

29. In addition, Chenery hired multiple law and accounting firms throughout Asia at LeBoeuf's recommendation to render opinions or advice on local law issues.

30. In short, whatever LeBoeuf recommended, Chenery did at an expense of over $5 Million in fees to create the NPL Program.

31. LeBoeuf took no entrepreneurial risk in connection with its work on behalf of Chenery. For every hour (or portion thereof) a LeBoeuf attorney worked, LeBoeuf billed Chenery on a monthly basis for that hour (or portion thereof) at that attorney's standard hourly rate.

32. Similarly, for every expense/disbursement LeBoeuf incurred in connection with its work on behalf of Chenery, LeBoeuf was reimbursed for such expense/disbursement dollar for dollar on a monthly basis.

33. Chenery paid all of LeBoeuf's invoices upon their presentment.

34. As Chenery was developing the NPL Program with the daily advice of LeBoeuf, Chenery was introduced to MyCFO LLC ("MyCFO").

35. MyCFO was in the business of providing various financial services to high net worth individuals.

36. Ultimately, MyCFO, Taylor and LeBeouf became principal promoters of the Chenery NPL Program in 2001 and 2002.

37. LeBoeuf accepted the engagement of MyCFO and individual clients of MyCFO to provide legal and tax advice relating to their investment in the Chenery NPL Program.

38. LeBoeuf was paid substantial fees in excess of $500,000 for rendering such advice.

39. As part of the legal services it performed for Chenery, on December 3, 2001 LeBoeuf issued a formal written opinion to Hahn and Chenery (the "Opinion"). A copy of that opinion is annexed hereto as Exhibit A.

40. Among other things, the Opinion addresses the question: "Is Chenery Required to Register NPL as a Tax Shelter Pursuant to IRC Section 6111?"

41. The Opinion answers that question in the negative.

42. In reliance upon LeBoeuf's legal advice, Chenery did not register NPL as a tax shelter.

43. Approximately 28 investors invested approximately $45 Million in the NPL program in 2001 and 2002.

44. In or about April 2002 MyCFO advised these investors to voluntarily disclose their participation in the Chenery NPL Program to the IRS tax shelter amnesty initiative.

45. Between 2003 and 2010 Chenery, CMI, Hahn, Austin and LeBoeuf were sued in at least four separate actions by investors in the NPL program.

46. Chenery, Hahn and Austin spent not less than $1 Million in defense of those actions.

47. In or about 2002 LeBoeuf suggested that Chenery and other persons with common legal interests contribute to the funding of a "test case" to establish the correctness of the legal advice that LeBoeuf and others had given regarding programs like the NPL program.

48. Chenery took LeBoeuf's suggestion and contributed $250,000 to fund this test case in part because LeBoeuf itself had contributed $100,000 to fund the test case.

49. On March 29, 2012, the IRS assessed $7,719,594 in promoter penalties pursuant to Section 6707 of the Code against Chenery, CMI and Hahn by reason of the failure of Chenery to register the NPL program as a tax shelter in 2001 and 2002.

50. Prior to the entry of this assessment, Chenery has spent in excess of $1 Million defending the position it had taken in reliance upon LeBoeuf's legal advice.

51. In imposing these penalties the IRS held that it was not "reasonable" for Plaintiffs to have relied upon the Opinion because LeBeouf was not "independent."

52. In November 2012, the IRS advised Chenery, CMI and Hahn that Graham Taylor had testified under oath on March 20, 2009, at the trial of an action entitled *United States of America v. Robert Coplan, Martin Nissenbaum, Richard Shapiro, Brian Vaughn*, 07-cr-453, U.S. District Court, Southern District of New York, that he knew at the time that LeBoeuf gave the Opinion it "contained false statements."

## AS AND FOR A FIRST CLAIM
### (Legal Malpractice)

53. Plaintiffs respectfully repeat and reaver each and every averment of paragraphs 1 through 47 as if fully set forth herein.

54. LeBoeuf failed to exercise the ordinary, reasonable skills and knowledge commonly possessed by a member of the legal profession in rendering advice to Plaintiffs generally and in particular in giving the Opinion for at least the following five reasons:

    a. Although the Opinion cites Treasury Reg. Sec. 1.6664-4(b) in passing, it in substance states that that regulation is invalid by reason of its failure to address that portion of the regulation that states in the context of using reliance on an appraisal "as an example" the sentence that states: "Other factors to consider include the methodology and assumptions underlying the appraisal, the appraised

value, the relationship between the appraised value and the purchase price, **the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer** or to the activity to which the property is used (emphasis added);"

b. The Opinion fails to address *Ryback v. CIR,* 91 T.C. 524 (1988) (negligence penalty sustained when taxpayer relied on advice of person who was not independent of promoter);

c. The Opinion fails to address *Chamberlain v. CIR,* 66 F. 3d 729 (5TH Cir. 1995) (taxpayers may not rely on someone with an inherent conflict of interest);

d. The Opinion fails to address *Pasternak v. CIR,* 990 F.3d 893 (6th Cir. 1993) ("advisers were either the promoters or agent of the promoters ... and can hardly be described as 'independent professionals);"

e. The Opinion fails to address the fact that not all of the conditions of Treas. Reg. Sec. 1.6664(c)(1) are satisfied, particularly Treas. Reg. 1.6664-4(c)(1)(iii);"

f. Accordingly, the Opinion failed to anticipate the 7th Circuit's ruling in *American Boat Co., LLC v. U.S.,* 583 F.3d 471 (7th Cir. 2009).

55. This failure to exercise the ordinary, reasonable skills and knowledge commonly possessed by a member of the legal profession proximately caused damages to Plaintiffs.

56. "But for" these breaches of duty by LeBoeuf, Plaintiffs would not have suffered additional legal fees, costs, loss of income, loss of profits, imposition of tax penalties, additional constraints while continuing in litigation, and other consequential damages, all required to avoid, minimize or reduce damages caused by LeBoeuf's wrongful conduct. WHEREFORE, Plaintiffs demand judgment in an amount to be determined at trial, but no less than $50 Million, together with interest, the costs of this action and such other, further or different relief as to the Court may seem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: New York, New York
       October 22, 2013

                          BAINTON LYNCH LLP

                          By: _____
                             J. Joseph Bainton
                          *Attorneys for Plaintiff*
                          767 Third Avenue
                          New York, NY 10017
                          Telephone: (212) 201-5705
                          e-mail: bainton@baintonlynch.com

Exhibit A

# LeBoeuf, Lamb, Greene & Macrae
## L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

| | | |
|---|---|---|
| W YORK | ONE EMBARCADERO CENTER | LONDON |
| SHINGTON, D.C. | SAN FRANCISCO, CA 94111 | (A LONDON-BASED MULTINATIONAL PARTNERSHIP) |
| 3ANY | | |
| STON | (415) 951-1100 | |
| NVER | | PARIS |
| 3R1SBURG | FACSIMILE: (415) 951-1180 | BRUSSELS |
| RTFORD | TELEX: 471067 | JOHANNESBURG |
| JSTON | | (PTY) LTD |
| :KSONVILLE | WRITER'S DIRECT DIAL | MOSCOW |
| ; ANGELES | | RIYADH |
| VARK | | (AFFILIATED OFFICE) |
| TSBURGH | | TASHKENT |
| T LAKE CITY | December 3, 2001 | BISHKEK |
| I FRANCISCO | | ALMATY |
| | | BEIJING |

(415) 951-1121

E-Mail Address: GTaylor@LLGM.COM

Mr. Roy Hahn
Chenery Associates Incorporated
703 Market Street, Suite 1200
San Francisco, CA 94103

Dear Roy:

    In connection with the proposed offering to certain U.S. high net worth investors who are clients of myCFO, of Chenery Associates Asian Nonperforming Loan investment fund opportunities ("NPL"), you have requested our advice regarding: 1) whether Chenery Associates Incorporated ("Chenery") must register the NPL investment opportunity as a tax shelter pursuant to Internal Revenue Code ("IRC") Section 6111; (2) whether an investor in NPL's must disclose involvement in the investment under IRC Section 6011; (3) whether Chenery must maintain lists of participants in the NPL investments pursuant to IRC Section 6112; (4) if Chenery does not register NPL as a tax shelter and the IRS successfully argues that NPL should have been registered pursuant to IRC Section 6112, will Chenery be subject to the failure to register penalties pursuant to IRC Section 6707; (5) if Chenery does not maintain a list of participants pursuant to IRC Section 6112 and the IRS successfully argues it should have, whether Chenery is subject to the failure to maintain list of participants penalties pursuant to IRC Section 6708.

SF 03621 1 06874 (X)574 12 3 01 2 02:03 PM

I. **Is Chenery Required to Register NPL as a Tax Shelter Pursuant to IRC Section 6111?**

According to IRC Section 6111 and Temporary Treasury Regulations Section ("Temp. Reg.") 301.6111-2T(a), (1) any organizer of a "confidential corporate tax shelter" ("CCTS") must "register the tax shelter with the Secretary not later than the day on which the first offering for sale of interests in such tax shelter occurs;" (2) any person who sells an interest in a CCTS must furnish the tax shelter identification number to each investor; and (3) any person claiming any deduction, credit, or other tax benefit by reason of the CCTS must include the tax shelter identification number on the taxpayer's return claiming the benefit. Further, Section 6111(c) provides that a "tax shelter" means any substantial investment in which it could be reasonably inferred from the offering materials that the aggregate deductions and 200% of credits potentially allowable from the investment is at least twice the cumulative amount of money and the adjusted basis of other property invested during any of the first five (5) years ending after the first offering for sale of interests in such tax shelter occurs. An investment is a "substantial investment" if the aggregate amount offered for sale to investors exceeds $250,000 and five (5) or more investors are expected.

Additionally, IRC Section 6111(d)(1) provides that a "tax shelter" includes any entity, plan, arrangement, or transaction that has **all** three of the following characteristics; (1) a significant purpose of the structure is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation; (2) which is offered to any potential participant under conditions of confidentiality; and (3) for which the tax shelter promoters may receive fees in excess of $100,000 in the aggregate.

*Substantial Investment*

A U.S. taxpayer's NPL investment will consist solely of cash. The maximum potential allowable deduction from investment in NPL in any of the first five (5) years ending after the NPL was offered for sale will not be greater than the aggregate cash investment amount. No additional deductions are available (except to the extent additional cash is contributed by the investor to the NPL during the first five (5) years). Therefore, while the NPL investment is likely a substantial investment, it should not be a "tax shelter" under Section 6111(c) since aggregate deductions and credits potentially allowable during any of the first five (5) years is much less than twice the money invested during such years.

With respect to Section 6111(d) and the Treasury Regulations issued thereunder, it is important to note that these tax shelter rules and regulations only apply to corporations. Therefore, by its plain language, IRC Section 6111(d) and the Treasury Regulations thereunder do not apply to NPL investors (since you have advised that the investment is only offered to individuals). However, assuming arguendo that IRC Section 6111(d) and the Treasury Regulations thereunder apply to individuals, we will

also analyze the applicability of each of these required elements of a "tax shelter." However, even if Section 6111(d) and the Treasury Regulations issued thereunder applied to non-corporate investors, the NPL investment should fall outside the definition of a tax shelter, since not all of the required characteristics are present in the NPL investment:

### Significant Purpose of Tax Avoidance

The first of three requirements that must be met in order for a transaction to be considered a "tax shelter" is the "significant purpose of tax avoidance" requirement. Under Temp. Regs. 301.6111-2T(b)(1)-(4), a transaction has a significant purpose of avoidance or evasion of federal income tax if it is: (1) a "listed transaction," or (2) an "other tax-structured transaction."

Temp. Regs. 301.6111-2T(b)(2) states that a transaction is a listed transaction if it "is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction under section 6111."

The IRS enumerated its initial listed transactions in IRS Notice 2000-15 for purposes of the tax shelter rules under IRC Section 6111. The NPL investment opportunity was not included in IRS Notice 2000-15 or subsequently as a listed transaction. Therefore, the NPL investment opportunity also fails the "listed transaction" part of the "significant purpose of tax avoidance" requirement of a tax shelter.

Secondly, "other tax-structured transactions" include all transactions in which the federal income tax benefits constitute "an important part of the intended results of the transaction" and will be presented in the same form to more than one participant. However, the promoter can avoid this application if the promoter reasonably determines that there is no reasonable basis under Federal law for denial of any significant portion of the expected Federal income tax benefits from the transaction. The promoter qualifies for this exception if the promoter reasonably determines that the IRS would have no reasonable basis (as defined in Treasury Regulation Section 1.662-3(b)(3)) to disallow any significant portion of the expected Federal income tax benefits of the transaction.

Additionally, the promoter can avoid this application if it reasonably determines that the potential participant is expected to participate in the transaction in the ordinary course of his business [and] in a form consistent with customary practice and there is a generally accepted understanding that the expected Federal income tax benefits from the transaction are allowable under the IRC for substantially similar transactions.

First, based on the Sidley Austin Brown & Wood tax opinion, which we rely upon for this purpose, the IRS should have no reasonable basis (as defined in Treasury Regulation Section 1.662-3(b)(3)) to disallow any significant portion of the expected Federal income tax benefits of the transaction, inasmuch as any loss passing from the NPL investment to the investor relies solely on the basic principals of Code Sections 723, 1001, and 704 and should not be denied based on any of the judicially developed doctrines of "sham transaction," business purpose," or "economic substance."

Second, it has been represented to us that the NPL investment opportunity will only be offered, by Chenery Associates and myCFO, to sophisticated U.S. investor's who believe this type of investment diversifies their overall investment asset mix and will assist in meeting their overall investment and risk objectives and therefore is within the investor's ordinary scope and course of business. Also, there is a general accepted understanding that the principles of Sections 723, 1001, and 704 should produce the expected Federal income tax benefits from the NPL investment. As a result, the NPL investments should not constitute a transaction with a "significant purpose of avoidance or evasion of Federal income tax" because, as set forth in the Sidley Austin Brown & Wood tax opinion, which we rely upon for this purpose, the transaction should qualify under both exceptions provided in Temp. Reg. Section 301.6111-2T(b).

In sum, in the unlikely event that IRC Section 6111(d) and the Treasury Regulations thereunder also apply to individuals, the NPL investment opportunity should fail the "significant purpose of tax avoidance requirement" since it is not a "listed transaction" and, based upon the analysis set forth made above, the NPL investment should qualify under both exceptions contained in Temp. Reg. Section 301.6111-2T(b).

### Confidentiality

The second essential requirement for a transaction to be considered a tax shelter under IRC Section 6111 and the Temporary Regulations thereunder is that the transaction is offered under "conditions of confidentiality." Pursuant to Temp. Reg. 301.6111-2T, all facts and circumstances are taken into consideration, including "if an offeree's disclosure of the structure or tax aspects of the transaction is limited in any way by an express or implied understanding or agreement with or for the benefit of any tax shelter promoter". If the promoter (or any party other than the offeree) claims the transaction to be proprietary it will be considered made under conditions of confidentiality.

Temp. Reg. 301.6111-2T(c)(1) provides a rebuttable presumption that "an offer is not considered made under conditions of confidentiality if the tax shelter promoter enters into a written agreement with each person who participates or discusses participation in the transaction and such agreement expressly authorizes such persons to disclose every aspect of the transaction with any and all persons, without limitation of any kind."

Here, it has been represented to us that there is no express, implied, or other requirement of confidentiality as to the NPL investment relating to any offeree. Therefore, the "conditions of confidentiality" requirement should not be satisfied. Additionally, you have represented to us that all potential investors and Chenery will enter into agreements authorizing the investor to disclose every aspect of the transaction with any and all persons, without limitation of any kind. Therefore, the "conditions of confidentiality" requirement is not satisfied.

In conclusion, assuming the tax shelter rules apply to individuals and assuming the IRS is successful in arguing that the "significant purpose of tax avoidance" requirement is met, the NPL investment should still fall outside the definition of a "tax shelter" because it is not offered under "conditions of confidentiality."

### Fees in Excess of $100,000

The third and final requirement for a transaction to be a "tax shelter" is that the promoter must receive fees in excess of $100,000 in the aggregate. Any consideration a promoter receives is taken into account, including contingent fees and equity interests. Also, fees from all substantially similar transactions are considered part of the same tax shelter for purpose of the $100,000 fees test.

You have advised us that expected fees paid to Chenery Associates with respect to the NPL investment opportunity should exceed $100,000. Therefore, the NPL investment will satisfy the third requirement of the definition of a tax shelter. However, as discussed above, the NPL investment should not be considered a tax shelter because it is not being offered to corporations. You have also represented to us that the "significant purpose" of the NPL investment is not "tax avoidance" and it is not being offered under the "conditions of confidentially."

## II. Is a Participant Required to Disclose the NPL Investment Pursuant to IRC Section 6011?

IRC Section 6011 requires corporate taxpayers to "make a return or statement according to the forms and regulations prescribed by the Secretary". Temporary and Proposed Treasury Regulations (Temp. Reg.) 1.6011-4T issued pursuant to IRC Section 6011 requires corporate taxpayers to disclose participation in certain tax-motivated transactions on their tax returns. These "reportable transactions" are defined as: (1) transactions identified by the Internal Revenue Service ("IRS") to be a tax avoidance transaction and which have been identified in a public notice as a listed transaction and (2) transactions that have at least two of the five characteristics noted in Temp. Reg. 1.6011-4T(b)(3). These characteristics include (A) confidentiality, (B) downside protection, (C) contingent promoter compensation, (D) material book/tax difference, and (E) participants with different tax status. Moreover, even if a transaction

meets one of the two broad tests, it is not a reportable unless it also satisfies the "projected tax effect" test.

According to Temp. Reg. 1.6011-4T(b)(4), if the taxpayer reasonably expects a listed transaction to reduce his federal income tax liability by more than $1 million in a single year or more than $2 million for any combination of years the transaction is reportable. For "other reportable transactions" the tax effect must exceed $5 million for any single tax year and more than $10 million for any combination of years.

You have advised us that the NPL investment is being offered only to, and implemented by, individual U.S. taxpayers. Therefore, since the disclosure rules only apply to corporate taxpayers, the NPL investment is not required to be disclosed on an individual taxpayer's tax return (and, as a result, it is not necessary to determine whether the NPL investment is a "reportable transaction"). However, in the event that the NPL investment is in fact offered to corporate taxpayers, such taxpayers could be required to disclose the transaction on their tax returns if the NPL investment is found to be a "reportable transaction", (unless the corporate taxpayer meets one of the available exceptions).

Assuming arguendo that the disclosure requirement applies to individuals as well as corporations, NPL investors may need to disclose their participation under the "reportable transaction" test. The NPL investment may be considered a reportable transaction because it may satisfy two of the five required characteristics noted in Temp.Reg. 1.6011-4T(b)(3). The NPL investment does not possess characteristics (A), (B), or (D) above since (1) it is not offered under conditions of confidentiality, (2) you have advised us that the investor's investment in the NPL represents a true investment that is subject to economic risk with no downside protection, and (3) the taxpayer does not file a schedule M-1 to a corporate income tax return. However, you have advised us that the NPL investment likely satisfies all of the remaining characteristics of a reportable transaction; (because sponsor compensation is dependent on the size of the transaction and therefore could be said to be based on a contingent fee rather than a fixed fee; and participants are likely to be in a substantially different tax status).

In conclusion, despite the fact that the NPL investment likely meets at least two of the five characteristics of a "reportable transaction", it will still not be a "reportable transaction" because the tax shelter disclosure rules apply only to corporations and the NPL investment will only be offered to individuals.

### III. Is Chenery Required to Maintain Lists of Investors in the NPL Investment Pursuant to IRC Section 6112?

Under IRC Section 6112, "organizers" and "sellers" of "potentially abusive tax shelters" are required to maintain lists of investors. Temp. Reg. 301.6112-1T expands upon the requirements for a tax shelter promoter to maintain lists of investors and offering materials of "listed transactions" and of transactions in which a "significant purpose of the structure is the avoidance or evasion of Federal income tax within the meaning of Section 6111(d)(1)(A) and § 301.6111-2T(b)" and to make such information available to the Secretary of the Treasury for inspection.

Temp. Reg. 301.6111-2T (b)(4) contains the rules for the Secretary's determination of what arrangements have potential for tax avoidance or evasion Temp. Reg. Section 301.6111-2T(b)(1) clarifies that a "significant purpose" is avoidance or evasion if the transaction is the same or substantially similar to a "listed transaction" or if the transaction has been structured to produce Federal income tax benefits that constitute "an important part of the intended results of the transaction" and will be presented in the same form to more than one participant. However, the Code, the Treasury Regulations, and the rulings do not quantify when the Federal income tax benefits constituted "an important part" of the transaction. However, Temp. Reg. Section 301.6111-2T(b)(4) exempts from the "significant purpose" classification transactions in which the tax shelter promoter "reasonably determines that there is no reasonable basis under Federal law for denial of any significant portion of the expected Federal income tax benefits from the transaction." The promoter qualifies for this exception if he reasonably determines that the Service would have no reasonable basis (as defined in Treasury Regulation Section 1.662-3(b)(3)) to disallow any significant portion of the expected Federal income tax benefits of the transaction.

The IRS has not included the NPL investment as a "listed transaction" nor has the NPL investment been determined to be a "listed transaction" pursuant to regulations issued by the Treasury. Thus, in order for the list maintenance requirement to apply to Chenery, the NPL investment would need to be considered a transaction in which a "significant purpose of the structure is the avoidance or evasion of Federal income tax". However, as described above in the Section 6111(d) analysis (and for the reasons there stated), the NPL investment should not constitute a transaction with a significant purpose of avoidance or evasion of Federal income tax, because the transaction should qualify under both exceptions provided in Temp. Reg. Section 301.6111-2T(b)

### IV. Assuming the IRS Successfully Argues that the NPL Investment is a Tax Shelter, Will Chenery be Subject to the Failure to Register Penalties Pursuant to IRC Section 6707?

IRC Section 6707(a) imposes a penalty on persons who are required to register a tax shelter pursuant to IRC Section 6111 and the Treasury Regulation thereunder and

fail to do so. Assuming <u>arguendo</u> that the IRS successfully argues that the tax shelter rules apply to individuals, as well as corporations, and that the NPL investment satisfies the three requirements of a tax shelter, Chenery may be subject to penalties for failure to register the NPL investment as a tax shelter unless there is a "reasonable cause" to justify the failure to register.

The "reasonable cause" exception to the IRC Section 6707(a) penalty is set forth in Temp. Reg. 301.6707-1T, Q&A 4. There the Regulation states that the determination of whether reasonable cause exists for failure to register a tax shelter is a question of fact. The regulations do not provide any further details. The Internal Revenue Service Manual ("IRM") does not provide any further detail, although, it does refer to existing regulations for examples of circumstances that may be helpful in determining if a taxpayer has established "reasonable cause" (see IRM 120.1.3.1.1).

The Regulations under IRC Sections 6664 and 6694 provide some details regarding the avoidance of penalties due to reliance on an opinion or reliance on advice of a tax preparer. Treas. Reg. 1.6664-4(c)(1) discusses how reliance upon an opinion or advice can qualify for the reasonable cause or good faith exception to IRC Section 6662 penalties (accuracy related penalties). The Regulations state that all facts and circumstances must be considered; no unreasonable assumptions can be made and the taxpayer must not have known (or should have known) that the advisor lacked knowledge in the relevant aspects of Federal tax law. Treas. Reg. 1.6694-2(d)(5) discusses how an income tax preparer can avoid the penalty for understatement due to an unrealistic position by relying upon advice of another preparer. It states that the exception applies "if the preparer relied in good faith on the advice of another preparer who the preparer had reason to believe was competent to render such advice."

Based upon the foregoing, Chenery's reliance upon professional advice that the NPL investment does not need to be registered as a tax shelter should constitute "reasonable cause" and thus be sufficient to avoid any penalties under IRC Section 6707(a) (relating to failure to register a tax shelter).

V. **If the IRS Successfully Argues that Chenery Should Have Maintained a List of Participants in the NPL investment, Will Chenery be Subject to the Failure to Maintain List of Investor Penalties Pursuant to IRC Section 6708?**

Based upon the above analysis (and for the reasons stated), Chenery should not be subject to the list requirement since the NPL investment should not be considered a "potentially abusive tax shelter" under IRC Sections 6111 and 6112.

However, assuming <u>arguendo</u> that the IRS successfully argues that the NPL investment is a tax shelter and that the requirement to maintain a list of participants applies, Chenery may be subject to penalties for failure to maintain a list of participants. There is no expressed "reasonable cause" exception in IRC Section 6708 or its

Regulations. However, Temp. Reg. 301.6707-1T does provide a reasonable cause exception for failure to register tax shelters. Since there is no specific guidance, applying the same analysis to the IRC Section 6708(a) penalties as previously applied to the potential penalties issue under IRC Section 6707(a), Chenery's reliance upon professional advice regarding no duty to maintain lists of investors should constitute "reasonable cause "and, therefore, avoid the penalties under IRC Section 6708(a) (related to failure to maintain investor lists).

As you will appreciate, this letter cannot be relied upon by anyone other than Chenery Associates.

Very truly yours,

Graham R. Taylor